WHALE v. RICE, Adm'x, et al.

No. 23723.   Sept. 17, 1935

Utterback & Stinson, for plaintiff in error.

Geo. E. Rider, for defendant in error, Rhoenna Rice.

Burke & Trice, for United States Fidelity & Guaranty Company.

BUSBY, J. This action was commenced in the county court of Marshall county on January 30, 1926, by H. M. Rice, as plaintiff, against Herbert M. Moore, S. A. Whale, and the United States Fidelity & Guaranty Company of Baltimore, Maryland. a corporation, as defendants. The plaintiff sought to recover from the defendants the sum of $750 in annual royalties and rentals alleged to be due under and by virtue of a departmental oil and gas lease. The plaintiff, H. M. Rice, died on May 14, 1931, and the cause was thereafter revived and subsequently maintained and prosecuted by Rhoenna Rice, administratrix of the estate of the deceased.

In October of 1931, the cause was tried to a jury in the court below, resulting in a verdict in favor of the plaintiff in the sum of $505. The trial court rendered judgment on the verdict for the sum stated, plus accrued interest thereon from the date the action was commenced.

The defendant S. A. Whale brings the cause to this court on appeal for review, appearing herein as plaintiff in error. The defendant United States Fidelity & Guaranty Company presents a cross-petition in error. The defendant Herbert M. Moore has not appealed, and the judgment of the county court, is final as to him. For the sake of convenience we will continue to refer to the parties in the order of their appearance in the court below. The general term "defendants" will be used on occasion in this opinion to refer only to the defendants who have appealed. The defendants complain: (1) That there was error committed by the trial court in determining the amount of recovery. in that the jury was permitted to include $200 which became due under the lease on September 23, 1926, some six or seven days before the lease was canceled; (2) that the proof introduced by the plaintiff is insufficient; (3) that the lower court erred in restricting the scope of cross-examination when the defendant S. A. Whale was placed on the stand as a witness for

the plaintiff; and (4) that the lower court erred in adding interest to the amount of recovery as specified in the verdict. The defendant United States Fidelity & Guaranty Company also, urges in behalf of itself only that the lower court erred in holding it liable to the plaintiff in any sum.

Preliminary to a consideration of these various contentions, it is essential that we review briefly the facts in this case.

On July 3, 1920, Nicholas McGilberry, a full-blood citizen of the Choctaw Nation, who was then the owner of 100 acres of allotted land which was restricted as to alienation, executed an oil and gas lease on that land to the defendant Herbert M. Moore. The lease was on a form prescribed by the Department of the Interior commonly referred to as a departmental oil and gas lease. This lease was approved by the Secretary of the Interior. A bond was executed in connection with the lease by Moore, as principal, and the United States Fidelity & Guaranty Company, as surety, which was also approved by the Secretary of the Interior on September 23, 1920. The purpose of the bond was to secure the faithful performance by the lessee of the obligations and conditions imposed by the terms of the lease. Among other obligations imposed upon the lessee by the lease, was the payment of annual rentals and royalties in an amount therein specified, the alleged nonpayment of which resulted in this action.

On July 10, 1920, restrictions on the alienation of the land of McGilberry were removed by the Secretary of the Interior to be effective 30 days after date. Thus the removal of restrictions became effective on August 9, 1920. On April 13, 1921, McGilberry conveyed the land to H. M. Rice, the original plaintiff in this action, and on December 2, 1921, the original lessee, Moore, assigned the lease to the defendant S. A. Whale.

By the terms of the lease the rentals and royalties became due on the 23rd day of September of each succeeding calendar year during the life of the lease. The rentals and royalties falling due in 1921 and 1922 were paid. The plaintiff's recovery in this action was for royalties and rentals falling due on September 23rd of the years 1923, 1924 and 1925. On September 29, 1925, or very soon thereafter, a release of the oil and gas lease was executed by the defendant S. A. Whale and delivered to the landowner, H. M. Rice. Thus the due date of the last rental and royalty payment included in the ver-

dict, which was for $200, was only about a week before the cancellation or surrender of the lease. The defendants urge that by demanding and receiving the release, the plaintiff waived his right to collect the rental and royalty, even though they were then past due. They say it would be unjust for the plaintiff to receive the benefit of a release and collect the rental which fell due only a few days before.

Our decision on this point must be governed by the terms and provisions of the lease contract and not by what we think the parties should have agreed to. In dealing with the obligation of the lessee to pay advance royalties, the lease contract provides in part:

"Nor shall the lessee be relieved from its obligation to pay such advance royalty annually when it becomes due by reason of any subsequent surrender or cancellation of this lease."

Concerning the payment of annual rentals the lease provides:

"The lessee shall exercise diligence in sinking wells for oil and natural gas on and covered by this lease and shall drill at least one well thereon within one year from the date of the approval of this lease by the Secretary of the Interior, or shall pay to said Superintendent for the Five Civilized Tribes, Muskogee, Okla., for the use and benefit of the lessor, for each whole year. the completion of such well is delayed after the date of such approval by the Secretary of the Interior, for not to exceed ten years from the date of such approval, in addition to the other considerations named herein, a rental of one dollar per acre, payable annually; and if the lessee shall fail to drill at least one well within any such yearly period and shall fail to surrender this lease by executing and recording a proper release thereof and otherwise complying with paragraph numbered 7 hereof on or before the end of any such year during which the completion of such well is delayed, **such failure shall be taken and held as conclusively evidencing the election and covenant of the lessee to pay the rental of one dollar per acre for such year and thereupon the lessee shall be absolutely obligated to pay such rental.**"

Thus by the terms of the lease the obligation of the lessee to pay royalty and rental became definite and fixed on the due date thereof, and the first contention of the defendant is answered by the terms of the lease itself and further discussion of that point is unnecessary.

We shall next consider the assertion of the defendants that the proof is insufficient. The specific argument under this point is that the plaintiff failed to prove that the

amount alleged to be due had not been paid. No authorities are cited by the defendants in support of their argument. Payment is an affirmative defense and must be pleaded and proved by the defendant. The argument that the negative of this affirmative defense must be proved by the plaintiff is without merit.

The defendants next urge that the learned trial judge improperly limited the scope of the cross-examination of the defendant S. A. Whale when he was called as a witness for the plaintiff. The record discloses that the defendant S. A. Whale was placed on the stand by the plaintiff for the purpose of identifying certain letters. On cross-examination defendants' counsel propounded certain inquiries to him seeking to elicit information in explanation of the contents of the instruments identified. The trial court on objection of the plaintiff ruled that this was improper cross-examination and suggested that if the defendant desired to make himself a witness in his own behalf, he would be permitted to inquire at that point in the trial. Counsel for the defendant did not take advantage of this suggestion, but insisted that they might rightfully cross-examine on the matters indicated. While the scope of cross-examination is rather liberal, especially when the purpose of the cross-examination is to impeach or contradict a witness or discredit his testimony, it is obvious in this case that such was not the purpose of the cross-examination, since the witness was the defendant himself, and it can hardly be urged that the defendant would seek to discredit himself during the trial of the case. The real purpose of this cross-examination was to elicit information. Assuming without deciding that the scope of the cross-examination was improperly limited, the error, if any, was later cured for the reason that the same witness later took the stand in his own behalf and on direct examination was permitted to testify to all matters previously excluded which were proper subjects of inquiry. No complaint is made concerning the limitation of the inquiry on the subsequent direct examination of the same witness. In the case of Farmers Product & Supply Co. v. Bond, 61 Okla. 244, 161 P. 181, it was said in paragraph 5 of the syllabus:

"Error in the exclusion of the testimony of a witness is harmless, where such witness has already testified to the facts upon which his testimony is again offered, or where he is afterwards permitted to testify fully with reference to such facts."

Since the purpose of the examination in this case was proof of facts and not the impeachment of the witness, the rule above announced and the principle embodied therein is applicable to this case and determines the issue adversely to the contention of the defendant.

Defendants next urge that the trial court erred in rendering judgment for accrued interest in addition to the amount of recovery specified in the verdict. They assert that under the terms of the verdict the amount therein specified should be deemed to have been intended by the jury to include the accrued interest. In pressing this asserted error great stress is placed upon the language of the verdict which reads:

"We, the jury, lawfully impaneled and sworn in the above-entitled cause, upon our oaths do find from the law and the evidence in favor of the plaintiff for the sum of $505 with interest thereon at 6% per annum from the __ day of _____ to this date."

Certainly the language referring to interest is of doubtful import and no logical analysis thereof will lend any assistance in determining the true intent of the jury. Perhaps its existence in the verdict is not indicative of any intent on the part of the jury with reference to interest, but is best explained by the fact that it was included in the form of the verdict submitted to the jury and upon consideration of the case by the jury was neither stricken nor filled out. Certainly, in view of the record in this case, it is not entitled to controlling importance. The record reveals that the exact aggregate amount of unpaid 1923, 1924, and 1925 annual payments of rentals and royalties under the lease was $505, the precise amount found by the jury to be due. The record also reflects that these rentals were past due prior to the commencement of this action. Under these circumstances the liability for interest is fixed by the law and is not dependent upon any facts which could have been or were submitted to the jury. Thus it is clear that interest was not added in computing the amount specified in the verdict.

In the early case of St. Louis, El Reno & Western Ry. Co. v. Oliver, 17 Okla. 589, 87 P. 423, this court said:

"In a case tried by jury, where it is clearly apparent that the prevailing party is entitled to interest upon the amount found in the verdict, and it is unquestionably clear that the jury allowed no interest, or where the court reserved the question of allowance

534

of interest, until after verdict, and it is clearly ascertainable from the verdict or uncontroverted facts the dates from which and to which interest should be allowed, and the rate is fixed, the court may make the computation, and add the interest so found to the sum found in the verdict, and rendered judgment for the aggregate amount."

See, also, McEachin et al. v. Kinkaid, 99 Okla. 123, 225 P. 951; Chattanooga State Bank v. Citizens' State Bank, 39 Okla. 255, 134 P. 954; Wallingford et al. v. Alcorn, 75 Okla. 295, 183 P. 726.

The trial court applied the rule above stated to the case at bar, and under the facts in this case it did not err in so doing.

This brings us to a consideration of the last and most difficult question in this case: Was the United States Fidelity & Guaranty Company, surety of the original lessee, released from liability to the plaintiff in this case?

In the recent case of Tate v. Bristow, 172 Okla. 404, 45 P. (2d) 153, it was decided by this court in dealing with a lease and bond identical to those presented in this case that neither the removal of restrictions by the Secretary of the Interior nor the subsequent sale of the land released the surety on the original lessee's bond. The question of whether an assignment of the lease released the surety was not decided in this case, since it was determined on a disputed question of fact that the assignment involved in that case was not received by the assignee. Neither of the parties to this action call our attention to any case specifically determining the effect of an assignment of a departmental oil and gas lease by the lessee on the liability of the surety, and we must therefore decide the question on the application of general principles.

The argument of the surety company is based upon the principle that an alteration in the terms of a contract without the consent of the surety releases the surety. The principle invoked is well recognized in law. As stated by the Supreme Court of the United States in the early case of Miller v. Stewart, 9 Wheat. (U. S.) 681:

"Nothing can be clearer, both upon principle and authority, than the doctrine that the liability of a surety is not to be extended by implication beyond the terms of his contract. To the extent, and in the manner, and under the circumstances pointed out in his obligation, he is bound, and no further. It is not sufficient that he may sustain no injury by a change in the contract, or that it may even be for his benefit. He has a right to stand upon the very terms of his contract,

and if he does not assent to any variation of it, and a variation is made, it is fatal."

See, also, R. C. L. 1060; Friendly v. National Surety Co. et al. (Wash.) 89 P. 117, 10 L. R. A. (N. S.) 1160.

In connection with the application of this rule it is proper to mention again that the rentals and royalties which constitute the basis of the judgment in this case became due and payable after the original lessee, Moore, had assigned the lease. However, since Moore had, by the terms of the lease, obligated himself to pay the rent, the assignment of the lease by him and the subsequent payments of rents and royalties by the assignee did not relieve him of the obligation to pay unpaid rentals and royalties falling due under the lease. McFarland v. Mayo et al., 65 Okla. 28, 162 P. 753; see, also, 36 C. J. p. 375; 16 R. C. L. 843, par. 343; 16 R. C. L. 846.

But the fact that Moore was still liable for the payment of rent did not necessarily mean that his surety was also liable, since the liability of the surety must be tested by determining whether the assignment constituted an alteration of the terms of the surety contract, and, although Moore, the principal, could not complain of the assignment because he made it himself. his surety might, if the same was made without his consent and constituted an alteration of the contract and was consented to by the lessor or landowner.

The assignment in this case was made without the consent of the surety, unless, by the terms of the lease contract, the same was assignable, in which case the surety must be deemed to have consented at the inception of the contract. In other words, the assignment of an assignable lease, even though consented to by the lessor, does not constitute an alteration of the contract, and therefore does not operate to relieve the surety.

Thus the test in determining whether there has been an alteration in the terms and provisions of the lease contract by the assignment thereof is whether the assignment made was prohibited by the terms of the lease. The rule is thus stated in 16 R. C. L., sec. 441, page 934:

"If the assignment of the premises is not prohibited by the lease, the liability of a surety is not affected thereby, though the lessor consented to the assignment and accepted payment of rent from the assignee, and likewise a subletting does not affect the surety's liability if there was no provision in the lease against a subletting, though

made without the consent of the surety. If, however, the lease prohibits an assignment or subletting the surety will be discharged if it is with the consent of the lessor."

The application of the foregoing rule and the underlying principles to the case at bar requires an examination and analysis of the particular provisions of the lease herein involved. Paragraph 13 of the lease provides:

"Each and every clause and covenant in this indenture shall extend to the heirs, executors, administrators, successors, and lawful assigns of the parties hereto."

While the above-quoted provision of the lease does not specifically authorize an assignment, the language appearing therein indicates that it was contemplated by the parties that the same should be assignable. This provision of the lease must be viewed in connection with paragraph 11 thereof, which reads:

"Assignment of this lease or any interest therein may be made with the approval of the Secretary of the Interior, it being understood that to secure such approval the proposed assignee need only be qualified to hold such a lease under the rules and regulations, and furnish a bond with responsible surety to the satisfaction of the Secretary of the Interior, conditioned for the faithful performance of the covenants and conditions of this lease."

From an examination of this provision of the lease it is clear that prior to the removal of restrictions and while the lease was under the control of the Secretary of the Interior, it could not be assigned without the approval of the Secretary of the Interior and the execution of a bond by the assignee. It is important to note at this point that the power and authority thus conferred upon the Secretary of the Interior to approve the assignment and require a bond is not by the terms of the paragraph conferred upon the lessor after the removal of restrictions. The succeeding paragraph of the lease indicates that this power shall cease to exist after the removal of restrictions. It reads:

"In event restrictions on alienation shall be removed from all the leasehold premises described above, this lease shall be released from the supervision of the Secretary of the Interior, such release to take effect without further agreement, from the date such restrictions are removed, and thereupon the authority and power delegated to the Secretary of the Interior as herein provided shall cease, and all payments required to be made to said Superintendent for the Five Civilized Tribes, Muskogee, Okla., shall thereafter be made to lessor or the then owner of said lands in person or be deposited to the credit of said lessor or his assigns at the First State Bank of Stigler, or such other place as the said lessor or his assigns may from time to time designate in writing, and changes in regulations thereafter made by the Secretary of the Interior applicable to oil and gas leases shall not apply to this lease."

It is urged by the surety company in this case that even after the removal of restrictions the lease involved herein could not be assigned except upon the execution of a bond by the assignee, and that the failure of the lessor in this case to require the execution of such a bond constituted an alteration of the contract and released the surety of the original lessee. The merits of this argument depend upon whether the execution of a bond continued to be essential to a valid assignment after the power of the Secretary of the Interior had ceased. In order to hold that the power of the Secretary of the Interior to require a bond passed to the lessor after the removal of restrictions, it would be necessary for us to read into the contract something which does not specifically appear therein. If it was the intention of the parties at the time this contract was made to preserve this requirement after removal of restrictions, appropriate language could easily have been incorporated in the lease to accomplish that result. An examination of the other provisions of the lease discloses that when it was desired to preserve the power and authority of the Secretary of the Interior after the removal of restrictions and confer the same upon the lessor, the parties had no difficulty in choosing language to clearly express that intent. For instance, section 9 of the lease reads:

"Upon the violation of any of the substantial terms and conditions of this lease the Secretary of the Interior (or lessor, in event restrictions are removed as provided in paragraph 12 hereof) shall have the right, at any time after 30 days' notice to the lessee specifying the terms or conditions violated, to declare this lease null and void, and the lessor shall then be entitled and authorized to take immediate possession of the land."

It is thus apparent that by the terms and provisions of the lease the assignment of the lease after the removal of restrictions without a bond by the assignee is not prohibited by the terms of the lease. A construction placing such a restriction on assignment of the lease could only be accomplished by a most liberal judicial interpretation. We are inclined to the view that such

was not the intention of the parties. This for the reason that it is a matter of common knowledge that when land becomes subject to alienation, regardless of whether it is Indian land or not, it is quite common to sell and convey fractional portions of the royalty interests therein, or even of the land itself. Thus, after the removal of restrictions, it can reasonably be anticipated that many tracts of land subject to departmental oil and gas leases would be divided among many owners. If we should hold that such a lease could only be assigned with the consent and approval of the owner or owners of the land, upon the execution of a bond approved by the owners, it can easily be seen that the commercial value of departmental oil and gas leases would be completely destroyed. Disagreement between owners of fractional interests would hamper and impede negotiations. Thus it appears that the parties to the lease intentionally failed to incorporate any language therein calculated to forbid the assignment of such lease after the removal of restrictions, except upon consent of the owner and the execution of a bond by the assignee.

This view of departmental oil and gas leases and the meaning of the terms thereof is further supported by the fact that on the older forms of such leases it was provided that the assignment could only be made with the consent of the lessor. See Scott et al. v. Signal Oil Co., 35 Okla. 172, 128 P. 694; Midland Oil Co. v. Turner, 179 Fed. 74.

We therefore hold that after the removal of restrictions the lease involved in this case became assignable without the consent of the lessor and without the execution of a bond by the assignee, and that, therefore, the assignment of the lease in this case with the consent of the landowner did not constitute an alteration of the surety's contract and did not release the surety.

In pressing its point the surety company has called our attention to certain rules and regulations of the Secretary of the Interior adopted in 1923 which are said to have a bearing upon this phase of the case. These rules and regulations, having been adopted subsequent to the execution of this lease, cannot be effective as to the right of assignment thereof by reason of the provisions of section 12 of the lease quoted, supra, and section 8 of the lease, which reads:

"This lease shall be subject to the regulations of the Secretary of the Interior, now or hereafter in force, relative to such leases, all of which regulations are made a part and condition of this lease: Provided, how-

ever, that no regulations made after the approval of this lease, affecting either the length of term of oil and gas leases, the rates of royalty or payment thereunder, of the assignment of leases, shall operate to affect the terms and conditions of this lease."

In view of these provisions of the lease, it is unnecessary to analyze the regulations referred to.

No error appearing in the proceedings before the trial court, the decision and judgment is affirmed.

McNEILL, C. J., and RILEY, PHELPS, and GIBSON, JJ., concur.