# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 152

### OCTOBER TERM, A.D. 2015

### December 2, 2015

PENNACO ENERGY, INC.,

Appellant
(Defendant),

v.                                                      S-15-0019

KD COMPANY LLC, a Wyoming close
limited liability company,

Appellee
(Plaintiff).

PENNACO ENERGY, INC.,

Appellant
(Defendant),

v.                                                      S-15-0020

FIRST NORTHERN BANK OF
WYOMING, BUFFALO, WYOMING,
AS TRUSTEE OF THE CREDIT
SHELTER TRUST ESTABLISHED ON
JANUARY 16, 2005, UNDER THE LEO
M. HOLLCROFT REVOCABLE TRUST,
DATED APRIL 12, 2002; and FIRST
NORTHERN BANK OF WYOMING,
BUFFALO, WYOMING, AS TRUSTEE
OF THE CLAIRE B. HOLLCROFT
REVOCABLE TRUST, DATED APRIL
12, 2001,

Appellees
(Plaintiffs).

*Appeals from the District Courts of Sheridan and Johnson Counties*
The Honorable William J. Edelman, Judge

*Representing Appellant:*
Marie R. Yeates and Michael A. Heidler of Vinson & Elkins, L.L.P., Houston, Texas; Mark R. Ruppert and Isaac N. Sutphin of Holland & Hart, LLP, Cheyenne, Wyoming. Argument by Ms. Yeates.

*Representing Appellees:*
Kendal R. Hoopes of Yonkee & Toner, LLP, Sheridan, Wyoming.

*Representing Petroleum Association of Wyoming, Amicus Curiae in Support of Pennaco Energy Inc.:*
Thomas F. Reese, Ryan J. Schwartz, William E. Reese, and Kyle A. Ridgeway of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

*Representing Texas Oil & Gas Association, Amicus Curiae in Support of Pennaco Energy Inc.:*
Timothy M. Stubson of Crowley Fleck PLLP, Casper, Wyoming.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]   Pennaco Energy, Inc. (Pennaco) obtained oil and gas leases in northeastern Wyoming.   Pennaco then made contracts with the surface landowners, who were predecessors of Appellees.  These agreements granted Pennaco access to and use of the landowners' land during exploration and production under the mineral leases.   In the agreements, Pennaco committed to pay for damages and for use of the land and, when operations ceased, to restore the land as nearly as possible to its prior condition.  Pennaco developed its coalbed methane operation, drilling for and producing gas, and made the required payments for several years.  It then assigned its interest in the operations and agreements to CEP-M Purchase, LLC (CEP-M), which re-assigned those interests to High Plains Gas, Inc. (High Plains Gas).  Since Pennaco's assignment, neither Pennaco nor the assignees have made any of the payments required under the agreements, nor have they reclaimed any of the land.

[¶2]  Appellees (referred to as landowners jointly, and individually as KD or Hollcroft) sued Pennaco, CEP-M and High Plains Gas for breach of the agreements.  CEP-M and High Plains Gas defaulted.  The district court granted summary judgment in favor of the landowners, concluding that Pennaco remained liable under the agreements even after assignment.

[¶3]   Pennaco appeals, claiming the district court erred in applying contract law to find that it remained liable under the agreements. Pennaco contends the agreements created covenants running with the land, which can only be enforced against someone in privity of estate with the landowners.  Upon assigning the agreements and leases to CEP-M, Pennaco asserts, it ceased to have privity of estate with the landowners and cannot be held liable under the agreements.  We conclude the district court correctly ruled Pennaco remains liable under the agreements, and affirm the judgments.

## ISSUES

[¶4]  The issues for our determination are:

1.      Whether the district court correctly ruled that Pennaco remains liable for performing the obligations under the agreements after assigning a portion of its interest under those agreements to a third party.

2.      Whether the district court properly awarded costs and attorney fees to the landowners.

## FACTS

1

[¶5]  The ranch lands at issue in these cases are located in the Powder River Basin in Sheridan County and Johnson County, Wyoming.  During the 1990s, Pennaco acquired interests in oil and gas leases for the mineral estate underlying the ranch lands.  Pennaco then made contracts with the surface owners, who were predecessors of KD and Hollcroft.  In those contracts, the surface owners granted Pennaco the right to enter the lands for purposes of drilling, completing and producing gas wells, constructing and maintaining access roads and power lines, and installing pipelines to transport gas and water produced from gas wells drilled on the lands.  In exchange, Pennaco agreed to make annual payments to the surface owners for use of the land and to compensate them for damages caused by its operations.  Pennaco agreed to restore all impacted land when the use ended.

[¶6]  In addition to the surface use agreements, Pennaco and the landowners entered into agreements concerning the disposal of water produced during the operations.  Those agreements required Pennaco to make annual payments and, when operations ceased, either restore the land or make the areas suitable for the landowners' use as water wells or reservoirs.

[¶7]  After signing the agreements, Pennaco began coalbed methane operations on the lands drilling numerous wells, constructing roads, building reservoirs for storing water produced from the wells, and installing underground pipelines and other infrastructure.  As required by the agreements, Pennaco made the annual surface damage and reservoir payments through 2010.  In 2009, Pennaco and Hollcroft signed agreements which required Pennaco to replace two of Hollcrofts' water wells and to pay for electricity to operate those wells.

[¶8]  In July 2010, Pennaco sold a portion of its oil and gas interests in the Powder River Basin to CEP-M.  The sale included part of Pennaco's interest in the leases underlying the ranch lands at issue and its rights under the surface agreements.  However, the sale expressly reserved Pennaco's interest in the "deep rights" covered by the leases and the rights of access to and use of the ranch property in order to explore and develop the deep rights.[1]  Pennaco also excluded monitoring wells and wells subject to a 2010 plugging and abandonment program along with surface access and other rights necessary to complete plugging and abandoning those wells.  Finally, Pennaco retained a right to complete, plug and abandon wells and restore the sites at CEP-M's expense if CEP-M failed to do so.

[¶9]  CEP-M then assigned its interests to High Plains Gas.  High Plains Gas began operating the wells, producing gas and discharging water into the reservoirs on the ranch

---

[1] The "deep rights" are those below the Tertiary Paleocene Ft. Union formation.

lands. No one, however, made any payments required under the contracts after Pennaco's assignments.

[¶10] By the time of the assignments, Pennaco had reclaimed a number of the wells it drilled on the ranch lands and reclaimed some of the roads it constructed. No one has reclaimed any wells, roads or reservoirs since the assignments. Annual payments required under the surface and damage agreements were not made after 2010. The annual payments required under the water storage agreements were not made after 2011. No one made electricity payments to the Hollcrofts as required by the water well replacement agreements after mid 2012.

[¶11] In 2012 and 2013, the landowners gave Pennaco, CEP-M and High Plains Gas notice that they were in default under the surface, damage and water storage agreements. When they did not cure the default, the landowners filed complaints against them in district court in Sheridan County[2] and in Johnson County[3] for breach of the agreements. Landowners sought judgment for all amounts due under the agreements. High Plains and CEP-M failed to answer the complaints and the district court entered default against them in both cases. The landowners and Pennaco then filed motions for summary judgment.

[¶12] Relying on well established principles of contract law, the landowners asserted that Pennaco remained liable under the contracts even after the assignments. Pennaco argued the landowners' analysis was not applicable because the parties to the agreements intended to create covenants running with the land, which could only be enforced against someone in privity of estate with the landowners. Pennaco claimed that upon assigning the agreements, it ceased to have privity of estate with the landowners. The district court determined that Pennaco remained liable under the contracts and granted judgments against Pennaco for past due payments of $63,864.90, plus interest, in the case filed in Sheridan County and $71,508.60, plus interest, in the Johnson County case. The district court also awarded the landowners attorney fees and costs. Pennaco timely appealed from the district court's judgments.

[¶13] Pennaco then filed a motion in this Court to consolidate the appeals involving KD and the Hollcrofts. KD and the Hollcrofts opposed consolidation for briefing purposes but agreed the cases should be consolidated for purposes of oral argument and this Court's decision. We entered an order granting the motion to consolidate for purposes of argument and decision. There are some differences between the KD contracts and the Hollcroft contracts, listed below, but much of the analysis of those contracts is the same. Consequently, this decision primarily addresses the agreements together. The Petroleum

---

[2] The lands of Appellee KD Company, LLC (KD) are in Sheridan County, so it filed its case there.

[3] The lands of Appellee First Northern Bank as Trustee of the Hollcroft Trusts (Hollcrofts) are in Johnson County.

3

Association of Wyoming (PAW) and Texas Oil and Gas Association (TOGA) filed motions requesting an order allowing them to file amicus briefs. We granted the motions.

## STANDARD OF REVIEW

[¶14] Pennaco appeals from district court orders granting summary judgment to KD and the Hollcrofts. Summary judgment is governed by W.R.C.P. 56(c), which states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We review a summary judgment *de novo*, using the same materials and following the same standards as the district court and examining the record from the vantage point most favorable to the party opposing the motion, giving that party the benefit of all favorable inferences which may fairly be drawn from the record. *Baker v. Speaks*, 2014 WY 117, ¶ 9, 334 P.3d 1215, 1219 (Wyo. 2014). The parties agree that there is no genuine issue as to any material fact. Each side asserts that it is entitled to a judgment as a matter of law based on the undisputed facts.

[¶15] Pennaco also appeals the district court judgments awarding KD and the Hollcrofts attorney fees and costs.

> The question of whether there is legal authority to award attorney fees is one of law, which we review *de novo*. *See*, *Thorkildsen v. Belden*, 2011 WY 26, ¶ 8, 247 P.3d 60, 62 (Wyo. 2011); *Ultra Resources, Inc. v. Hartman*, 2010 WY 36, ¶ 149, 226 P.3d 889, 935 (Wyo. 2010); *Breitenstine v. Breitenstine*, 2006 WY 48, ¶ 12, 132 P.3d 189, 193 (Wyo. 2006). The final attorney fee award is, however, reviewed for abuse of discretion. *Mueller v. Zimmer*, 2007 WY 195, ¶ 11, 173 P.3d 361, 364 (Wyo.2007).

*Evans v. Moyer*, 2012 WY 111, ¶ 37, 282 P.3d 1203, 1214 (Wyo. 2012).

## DISCUSSION

### 1. The Law of Contract Assignment Delegation, and of Covenants Running With the Land

[¶16] The key issue in this case is whether the relationship between Pennaco and the landowners, as established by their written agreements, is primarily a contractual relationship or one based on privity of estate involving covenants running with the land. As we begin our analysis, it is appropriate to provide a brief review of the law about the effect of assignments of contractual obligations and of covenants which run with the land.

[¶17] Well established principles of contract law dictate that a party who assigns/delegates a contractual duty remains responsible for performance of that duty.

> Rights are assigned; duties are delegated. When a right is assigned, the assignor ordinarily no longer has any interest in the claim. When a duty is delegated, however, the delegating party (delegant) continues to remain liable. If this was not so, every solvent person could obtain freedom from debts by delegating them to an insolvent. Delegation involves the appointment by the obligor-delegant of another to render performance on the obligor's behalf. It does not free the obligor-delegant from the duty to see to it that performance is rendered, unless there is a novation.

Joseph M. Perillo, *Contracts*, § 18.25, 665-666 (7th ed. 2014). *See also* Arthur L. Corbin, *Corbin on Contracts*, § 49.6, 206 (revised ed. 2007) ("If a party assigns his right and delegates his duty under a contract, he no longer has any right, but he remains liable as a surety for the performance of the duty."); E. Allan Farnsworth, *Farnsworth on Contracts,* § 11.10, 127 (3rd ed. 2004) ("a delegation of a performance does not relieve the delegating party of 'any duty to perform' or of any 'liability for breach.'"); Samuel Williston, *Williston on Contracts*, § 74.27, 412-413 (4th ed. 2003) ("one who owes money or is bound to any performance whatsoever cannot by its own act, or by any act in agreement with anyone else … divest itself of the duty and substitute the duty of another."); Restatement (Second) Contracts, § 318(3), 19 ("Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor.").

[¶18] The same principle applies to oil and gas leases.

> Another important area of concern for a lessee is whether the assignment of its rights and obligations under a lease to another party absolves it of all responsibility under the lease, or whether there are ongoing duties for which it may bear continued responsibility. **It is broadly understood that when an oil and gas lease is assigned, the assignee becomes responsible for all of the covenants in the lease (although,**

5

**as seen below, this does not automatically extinguish all obligations owed to the original lessor by the original lessee**).  The responsibility for the observance of covenants in the lease passes through to an assignee under the doctrine of privity of estate because they are covenants that run with the land.  Consequently, if an assignee in turn assigns the lease to yet another party, privity of estate is destroyed as to the prior assignee and it is no longer responsible to the original lessor for those covenants.

**Absent an express clause that terminates its obligations, the original lessee-assignor will continue to be responsible to the lessor for covenants in the lease under the doctrine of privity of contract.  Many oil and gas leases contain clauses eliminating contractual liability of this nature, but some do not.  Where they do not, the courts are nearly universal in their finding that the original lessee-assignor retains obligations to the lessor with respect to at least some of the covenants under the lease.**

62-4 CAIL Annual Institute on Oil and Gas Law § 4.03 (Institute for Energy Law of the Center for American and International Law's 56th Annual Institute on Oil & Gas, 2015) (emphasis added).  *See also* 6-49 Thompson on Real Property, Thomas Editions § 49-62 ("Neither an assignment nor sublease will release the lessee from liability on the express covenants of the lease because the lessee is in privity of contract with the lessor."); Williams& Meyers Oil & Gas Law § 403.1 ("The original lessee continues [to be] liable to the lessor for a breach of an express covenant of the lease occurring after his assignment of the lease unless the lease contains a clause excusing him from further liability after assignment."); 5-64 Eugene O. Kuntz, *Law of Oil and Gas* § 64.6 ("Under traditional landlord-tenant law, a landlord can hold both the original tenant and the tenant's assignee liable for breach of a lease covenant that runs with the estate.  The original tenant is liable under the initial contractual agreement (privity of contract) with the lessor, and the assignee is liable because it has accepted the benefit of the leasehold estate and must accept its attached burdens as well.").

[¶19]  Among the covenants the original lessee-assignor retains after assignment of its interest are those requiring payments of rentals and/or royalties and restoration of the surface to its original condition once production activities have ceased.

[1] Delay Rentals

In many leases there is an express covenant that the lessee either must drill a well within a specified time period or pay

6

delay rentals to the lessor. If the lessee fails to do so the lease is not terminated but the lessee is liable for the lessor for the unpaid rentals. As noted above, once the lease is assigned, this duty to drill or pay rentals primarily falls on the assignee. Nevertheless, courts have held that if the assignee fails to pay rentals, the lessor may bring an action directly against the original lessee-assignor for the collection of rentals. Of course, the original lessee-assignor, being in privity of contract with the offending assignee, may bring a suit against the assignee to recover these rentals or for other damages is may have suffered because of the failure to pay rentals.

### [2] Royalties

There is an express covenant in oil and gas leases requiring the payment of royalties to the lessor out of production under the lease. If the assignee fails to pay such royalties the lessor may sue the original lessee for them.

### [3] Restoration of Surface

Another obligation that may remain with the original lessee is the responsibility to restore the surface to its original condition once the production activities have ceased. Many leases contain such a requirement. In these cases, as with rentals and royalties due under the lease, the lessee may be held responsibile for restoration of the surface even if it did not conduct the operations at issue.

62-4 CAIL Annual Institute on Oil and Gas Law § 4.03.

[¶20] However, when the relationship between the parties is based on privity of estate, such as adjoining landowners where one has an access easement across his neighbor, the standard contract rule that one who delegates a duty remains responsible for performance may not apply. Duties requiring or prohibiting certain activity on the land, may "run with the land" and only obligate the party who is "in privity of estate," or connected to that land (unless the parties specify otherwise). In such a circumstance, the transfer of the land connected with the duty carries that duty to the assignee, and relieves the assignor of future responsibility. An example of such a circumstance is found in the Restatement (First) of Property §538, cmt. c:

A conveys Blackacre to B. B promises in behalf of himself, his executors, heirs and assigns that he will maintain a dam

7

upon the premises conveyed which dam will have the effect of maintaining a pond or lake on land retained by A at a specified level. Upon these facts it is proper to hold that upon conveyance of Blackacre by B his liability for future maintenance of the dam will cease.

An example more closely resembling the arguments of Pennaco follows: The owner of tract A obtains an access easement across tract B for the benefit of tract A, and promises to annually maintain the access easement for the benefit of both tract A and tract B. When the owner then transfers tract A to a third party, the easement and the maintenance obligation transfer with tract A. Then the original owner of tract A is no longer responsible for the annual maintenance of the easement.

[¶21] Obligations and rights which run with the land are known as servitudes. Restatement (Third) of Property (Servitudes) § 1.1. The principle that an original obligor on a servitude may not have continued responsibility for performance after transferring the related land is stated in the Restatement (Third) of Property (Servitudes) as follows:

### § 4.4. Duration of Original Parties' and Successors' Obligations and Enjoyment of Rights

If no duration is stated and the servitude has not terminated under Chapter 7, the duration of a party's obligation under, or right to enjoy the benefit of, a servitude, is as follows:

(1) An original party or successor to a servitude burden that runs with an interest in property incurs liability on account of the servitude burden only for obligations that accrue during the time the party or successor holds the burdened property interest.

[¶22] As we pointed out above, this servitude rule does not apply to obligations found in leases, including mineral leases. Comment *b*. to § 4.4 explains:

The difference results from the likely difference in the expectations of parties to leases and parties to covenants among fee owners. In the lease transaction, the duration of the tenant's liability is limited by the duration of the lease term, and the landlord is thought to have relied on the tenant's creditworthiness in determining to enter into the lease. By contrast, servitudes created by fee owners generally have an indeterminate or perpetual duration and neither party is likely

to have expected the other to be liable after transfer of the burdened interest.

Similarly, other types of obligations may be such that neither party likely expected the other to be liable after transfer of the burdened interest, or, as with a mineral lease, they may be obligations logically connected to the original obligor. Some burdens are obviously connected solely with use or possession of land. Others may be capable of being performed separately from possession or use of land, or are related to the original obligor. Amicus Curiae TOGA points out that "one can often infer from the nature of the act promised whether the parties intended for the promisor to be released of his obligations upon the transfer of the land," citing Restatement (First) of Property § 538, cmt. c.

[¶23] In summary, obligations based on a contract relationship continue to bind the original obligor even after the obligor assigns its interest in the contract. This principle recognizes that contracting parties should not be permitted to avoid contractual obligations simply by assigning them. It also recognizes that contracting parties expect each other to perform the contract unless they specify otherwise. On the other hand, obligations which are connected solely to ownership or use of an interest in land and which have no stated duration likely are based only on the ownership/use of the burdened property. In that situation, the parties likely intended that whoever held the interest or the burdened property would be responsible for performance, and did not intend the original obligor to be bound after it transferred its interests.

## 2. *The Contract Language*

[¶24] The core question with respect to these contracts is whether the parties intended to create contractual obligations which obligated Pennaco even after assignment, or whether they intended to create real estate servitudes which the parties would not have expected Pennaco to fulfill after assignment.

[¶25] The agreements in these cases are clearly contracts which contain covenants about the use of land as well as obligations which are not directly related to the use of any particular parcel of real estate. We interpret contracts and covenants in accordance with principles of contract law. *Stevens v. Elk Run Homeowners' Assoc.*, 2004 WY 63, ¶ 13, 90 P.3d 1162, 1166 (Wyo. 2004). (A covenant is a contract and is, therefore, construed in accordance with principles of contract law.) Our primary purpose is to determine the true intent and understanding of the parties at the time and place the agreement was made. *Stone v. Devon Energy Prod. Co., L.P.,* 2008 WY 49, ¶ 18, 181 P.3d 936, 942 (Wyo. 2008), citing *Wells Fargo Bank Wyo., N.A. v. Hodder*, 2006 WY 128, ¶ 21, 144 P.3d 401, 409 (Wyo. 2006). *See also Mathisen v. Thunder Basin Coal Co., LLC,* 2007 WY 161, 169 P.3d 61 (Wyo. 2007). We begin by considering *de novo* the plain language of the agreements. *Id*.

9

> When the language is clear and unambiguous, we limit our inquiry to the four corners of the document, giving the words contained therein their ordinary meaning. The parties are free to incorporate within their agreement whatever lawful terms they desire, and we are not at liberty, under the guise of judicial construction, to rewrite the agreement. It is only when a contract is ambiguous that we construe the document by resorting to rules of construction. A contract is ambiguous if indefiniteness of expression or double meaning obscures the parties' intent.

*Davidson Land Co., LLC v. Davidson*, 2011 WY 29, ¶ 14, 247 P.3d 67, 71 (Wyo. 2011), citing *Christensen v. Christensen*, 2008 WY 10, ¶ 13, 176 P.3d 626, 629 (Wyo. 2008) and *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 18, 123 P.3d 579, 587 (Wyo. 2005).

[¶26] We construe the language used in written agreements in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreements to ascertain the intent of the parties at the time the agreements were made. *Stone,* ¶ 18, 181 P.3d at 942. Extrinsic evidence can be considered in interpreting an unambiguous contract to the extent it involves facts and circumstances surrounding execution of the contract. *Wells Fargo,* ¶ 31, 144 P.3d at 412, citing *Hickman v. Groves*, 2003 WY 76, ¶ 11, 71 P.3d 256, 259-60 (Wyo. 2003); *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 6, 126 P.3d 909, 915 (Wyo. 2006). We look to parol evidence to understand the parties' intent only upon finding the document is ambiguous. *Wells Fargo, id*.

### a. KD/Pennaco Surface and Damage, and Disposal of Produced Water Agreements.

[¶27] The KD surface and damage agreement provides in relevant part that it is made and entered into between KD's predecessor in interest as "Owner" and Pennaco as "Operator." It states owner owns the surface of the lands and the lands are subject to oil and gas leases "either now held or hereafter acquired" by Pennaco. In the agreement, owner grants to Pennaco, "its employees and designated agents, a private right of way" to enter upon and use the lands to drill, complete and produce gas wells, construct and maintain access roads and power lines, and install pipelines to transport gas and water produced from the wells.

[¶28] The contract requires Pennaco to make payments to the owner as damages, including annual rental payments of $500.00 per year for each well drilled. This

obligation to pay continues beyond the time any well has ceased production until reclamation is complete. The agreement states:

> This annual payment shall be made on the anniversary date of this agreement in each and every year until the well has been plugged and abandoned and the location of any roads and pipelines constructed in connection therewith have been reclaimed as provided herein.

In this contract Pennaco promises to make annual payments of specified amounts for the use of new and existing roads on the lands, compression stations located on the lands and lands taken out of hay and crop production as a result of the coalbed methane operations. The rights granted to Pennaco by the surface owner terminate when Pennaco's right to explore for and develop gas from the land terminates or in the event of Pennaco's default.

[¶29] This surface and damage agreement requires Pennaco to rehabilitate and restore all areas disturbed by the coalbed methane operations as nearly as possible to their original condition. It states:

> Upon final termination of Operator's rights under this agreement and unless otherwise agreed by Owner, Operator shall return all roads and other rights of way or sites, as near as practical to the condition which they were in prior to the execution of this agreement, reseed all areas disturbed by Operator's activities, and remove all above ground facilities and render all pipelines and power lines environmentally safe and fit for abandonment in place and provide Owner with evidence that such lines have been made environmentally safe and fit for abandonment in place.

The contract specifies it is binding upon the successors and assigns of the parties.

[¶30] Like the surface and damage agreement, the disposal of produced water agreement identifies KD's predecessor in interest as "Owner" and Pennaco as "Operator." This contract requires Pennaco to pipe any produced water (except water re-injected into underground formations or piped underground to the Powder River) underground to reservoirs at locations designated by the landowner. The reservoirs must be permitted in the owner's name, but are constructed, operated and maintained at Pennaco's expense. Pennaco must make annual payments to the landowner for upgraded or new reservoirs. If requested by the landowner, Pennaco must remove the reservoirs and restore the property as nearly as possible to its original condition after produced water is no longer being discharged. The produced water storage agreement provides that it "shall be binding upon and inure to the benefit of the successors and assigns of the parties."

11

## b. *Hollcrofts/Pennaco Surface Use and Water Agreements*

[¶31]  The Hollcroft surface use agreement describes "Hollcroft & Company and its successors," as "Owner," and "Pennaco and its successors and assigns," as "Operator."  It states the Hollcrofts own the surface and Pennaco owns operating rights and an interest in gas leases covering portions of the lands.  In the agreement, Hollcrofts grant and convey to Pennaco an "easement of right-of-way," to perform operations necessary to the production of coalbed methane.  In exchange, Pennaco covenants to compensate Hollcrofts for damages occasioned by its activities on the land including user fees and specified annual fees for each well, use of the roads, compressor station facilities and pipelines.  Pennaco also covenants to clean up and restore all abandoned wells and roads at its expense.  Unlike the KD surface agreement, the Hollcroft surface contract provided that the obligation to pay specific fees for well and roads ended when the well permanently ceases production or the Operator has permanently ceased to use the road.

[¶32]  The Hollcroft surface use agreement also contains these provisions:

> ### 9
> The Owner agrees to notify Operator of any change in the party to be identified as Owner under this Agreement, which change might be caused by any conveyances or descent from the original Owner …  It is understood and agreed that the covenants made by Operator to owner under this Agreement are covenants running with the surface ownership of the subject lands, and that said rights must pass with said ownership and are not subject to retention by the party identified herein as Owner in the event of such a change in surface ownership.
>
> ### 10
> The right-of-way as granted hereunder to the Operator shall be non-exclusive and the Operator is granted the non-exclusive use of said private roads, whether existing or newly built by Operator or other parties, to be used by the Operator, its agents, servants, employees, other working interest owners, and successors in interest of ingress and egress across the lands of the owner to the specific wells as contemplated in Article 2 hereunder for as long as the payments required herein are timely made and the above referenced Gas Lease(s) shall continue to be valid and in full force and effect.
>
> . . . .

12

> This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

[¶33]  The Hollcroft surface use agreement originally provided that upon generating water from its operations, Pennaco could use produced water free of charge, working with the Hollcrofts to determine the best locations for surface discharge of water.  By an undated amendment, these provisions were removed and replaced with "the attached Agreement Concerning Disposal of Produced Water."  No such agreement appears in the record.  However, the record contains a second amendment dated October 10, 2003.  The amendment states it is entered into between "Hollcroft & Company", "as Owner," and "Pennaco" as "Operator".  It allows Pennaco to discharge produced water only under the terms of the agreement and in specified circumstances.  The amendment also requires Pennaco to clean up and restore any production wells the Hollcrofts choose not to continue operating as water wells after coalbed methane operations cease.

[¶34]  All the surface and water agreements require Pennaco to make payments on an annual basis.  The contracts indicate that such payments are installments on damages, even though they are paid on an annual basis.  The Hollcroft surface contract states "the compensation to be paid by the Operator to the owner hereunder shall be for the right-of-way … and in payment of damages … ."  The KD agreements state "the payments herein provided are … for damages … ."

[¶35]  Looking at the plain language of both the KD and Hollcroft agreements, it is clear the landowners intended to grant Pennaco, "its employees and agents" the right to enter and use the lands described for coalbed methane operations in the manner permitted by the agreements.  In exchange for the rights granted, Pennaco assumed obligations, including the obligations to make annual payments, plug and abandon wells when operations ceased, and reclaim the land.  The KD contract provides that Pennaco's rights end when its right to explore and produce gas from the lands terminates or in the event it defaults.  The Hollcroft contract states that Pennaco's rights end when its rights under the gas leases end.  Neither surface use contract states that Pennaco's **obligations** ended when its rights terminated.

[¶36]  The KD surface agreement required Pennaco, upon final termination of its rights under the agreement, to reclaim all surface areas disturbed by its operations, remove all facilities associated with those operations and provide proof that pipelines and power lines are environmentally safe for abandonment.  The Hollcroft surface agreement required Pennaco to restore all abandoned well sites and applicable roads.  Pennaco assigned its operations under the agreement to CEP-M and did not, therefore, fulfill those obligations at the time its rights terminated.  Nothing in these agreements suggests that

the parties intended Pennaco to be relieved of these obligations merely by assigning them to a third party. The obligations to reclaim and to pay until reclamation is complete presume an ability and willingness to perform after production ends. These are not the type of obligations that the parties would expect to be performed only by the last assignee of Pennaco. These obligations are not only, or even primarily, related to the last assignee's "ownership" of the gas leases. The obligations can be performed apart from any gas production by the last assignee. They are logically connected to Pennaco, its financial ability, and its initial creation of the gas operation, rather than to whatever the last assignee may have done.

[¶37]   Although both the KD surface and water agreements and the Hollcroft surface contract state they are binding on the parties' successors and assigns, neither agreement states an assignment terminates Pennaco's obligations. To the contrary, the KD agreement clearly provides that Pennaco was obligated to make the annual payments until the lands are reclaimed. The Hollcroft agreement requires payments until wells are abandoned. To read the agreements as providing that Pennaco's obligations terminate upon assignment would require writing words into the agreement the parties themselves did not include, something this Court is not at liberty to do. *Cheek v. Jackson Wax Museum, Inc.,* 2009 WY 151, ¶ 23, 220 P.3d 1288, 1293 (Wyo. 2009), citing *City of Gillette v. Hladky Constr., Inc.*, 2008 WY 134, ¶ 46, 196 P.3d 184, 200 (Wyo. 2008) and *Mathisen*, ¶ 12, 169 P.3d at 65.

[¶38]   The Hollcroft surface agreement contains a provision not found in Pennaco's KD surface contract. Section 9 of the agreement between Pennaco and the Hollcrofts requires the Hollcrofts to notify the operator if ownership of the surface changes. It also describes the covenants made by the operator as "covenants running with the surface ownership" which pass with ownership of the surface such that the original surface owner retains no rights to the promises made in those covenants. The agreement does not, however, state the covenants made by the operator pass with ownership of the mineral interest such that the original mineral owner's obligation to perform the covenants terminates upon assignment. If the parties intended the agreement to have the effect of passing both the surface owner's rights and the mineral owner's obligations upon transfer, we presume they would have included language to that effect in their agreement. The fact that the agreement expressly states the surface owner retains no rights upon transfer of ownership and does not say the mineral owner retains no obligations upon transfer supports the conclusion that the parties did not intend Pennaco's obligations to terminate upon assignment.[4]

---

[4] By this analysis we do not determine that a clause stating Pennaco's obligations were "covenants running with" its mineral leases would have indicated intent that Pennaco was no longer responsible after assignment of the leases and agreements. An exculpatory clause must expressly terminate the assignor's obligations upon assignment.

[¶39] Pennaco maintains the Hollcroft surface use agreement is clear that the obligations it imposes are to be performed by the lessee of the lands, i.e. the person with possession and use of the land for mineral exploration. The agreement contains no language imposing performance of the obligations on "the lessee of the lands" or the "person with possession and use of the land for mineral exploration." Rather, the agreement imposes the obligations on Pennaco and its successors and assigns. There is simply no language in the agreement referencing the "lessee of the lands" or "the person with possession and use of the lands for mineral exploration." Again, we will not rewrite the parties' agreements.

[¶40] Each of these contracts identifies when Pennaco's rights end and when Pennaco's obligations end. Each contains obligations based on Pennaco's promises and the benefits Pennaco received, rather than on any privity of estate. Under the plain and unambiguous language of both the KD and Hollcroft surface use agreements, Pennaco remains obligated to make the annual payments until the wells are plugged and abandoned and the lands are reclaimed. Under the plain language of both the KD and Hollcroft water agreements/amendment, Pennaco remains obligated to make the annual payments until discharge of produced water ceases.

[¶41] Based on the agreements themselves, we find the contracts Pennaco made with the landowners indicate an intent that Pennaco remain responsible for its promises to make damage payments and to perform reclamation. Factors indicating such intent are:

    a. Pennaco's rights and obligations are time limited. Each obligation and right has a specific ending event, unlike fee ownership.

    b. No agreement contains any language indicating Pennaco's obligations end upon assignment.

    c. Pennaco's interest in the lands is based on mineral leases, and the nature and extent of Pennaco's use of the lands depends on leases. Well established law recognizes that obligations under leases continue to bind the original lessee even after an assignment. The interests and obligations of Pennaco under the surface use agreements are analogous to mineral leases, not real property servitudes.

    d. The nature of Pennaco's obligations to make annual payments toward damages and to reclaim are logically connected with the entire contract and project. They are not logically connected with only the last assignee's use of the land.

    e. The obligation to reclaim, in particular, is an obligation that accrued from the very beginning of this project. Reclamation is not connected with gas production obtained by High Plains or any assignee, but is connected with all the work occurring during the project.

    f. Both the obligation to make damages payments and to reclaim the land are logically connected to the obligor's financial ability and willingness to fulfill those responsibilities. It is not reasonable to infer that the parties intended that

Pennaco could absolve itself of these obligations by assignment to an entity with an unknown financial ability and which may have no intention or motivation to fulfill the obligations.

g. Pennaco is identified as the "operator," not as a landowner. This term implies a personal obligation rather than one based on privity of estate.

h. With respect to the KD agreements, Pennaco's obligation to pay damages continues after production ceases and until reclamation occurs. This is not the type of obligation naturally connected with possession of the lands by the last assignee of Pennaco.

i. With respect to the Hollcroft agreement, the parties specified that the benefits to Hollcroft ran with the land and did not provide personal benefit to the landowner. However, the parties omitted any corresponding statement regarding Pennaco's obligations.

### 3.   *Supporting Case Law*

[¶42]   Other courts have concluded the assignment by a party of its obligations under a mineral production contract related to a mineral lease does not relieve the assignor of liability when the assignee fails to perform the obligations. In *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342 (Tex. 2006), Eland assigned to Nor-Tex Gas Corporation its interest in two offshore leases along with its rights and obligations under two joint operating agreements (JOAs) involving the leases. *Id*. at 344. Nor-Tex failed to pay its share of the operating costs under one of the JOAs and Seagull, as operator, brought suit against Nor-Tex and Eland for breach of the JOA. *Id*. Eland asserted it had no obligations under the JOA because it had assigned those obligations and its interest in the leases to Nor-Tex. *Id*. at 345. Finding that Seagull did not expressly release Eland following the assignment of its working interest and the JOA did not contain an express clause stating that Eland's obligations would cease if it assigned its interest to another party, the Texas Supreme Court held Eland was still liable to Seagull under the JOA despite the assignment to Nor-Tex. *Id*. at 347. In reaching that result, the Court relied on general principles of contract law:

> Generally speaking, a party cannot escape its obligations under a contract merely by assigning the contract to a third party. [citation omitted]  Thus, as a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract.

*Id*. at 346-47.

[¶43]   Pennaco and its amicus curiae, TOGA, contend *Seagull* does not apply under the circumstances presented in this case. They assert the court in *Seagull* applied principles

16

of general contract law only because Eland did not argue those principles were inapplicable but claimed instead that the contract expressly stated its obligations ended upon assignment. Pennaco and TOGA point to the court's reference in *Seagull* to Restatement of Property: Servitudes § 538 (now Restatement of Property: Servitudes (Third) § 4.4), which provides: "Whether a promise respecting the use of land of the promisor will continue to bind the promisor after he has ceased to have an interest in the land with respect to which the promise was made depends upon the intention manifested in the making of the promise." *Id*. They argue that the court in *Seagull* left open the question of whether application of § 4.4 or other principles concerning covenants running with the land would have led to a different result. Because the essence of Pennaco's argument in this case is that the agreements create covenants running with the land, Pennaco and TOGA assert *Seagull* is not applicable. They ask this Court to apply § 4.4 of the Restatement and conclude the intention manifested in the agreements at issue was to release Pennaco after its interest in the coalbed methane operations ceased.

[¶44] We have concluded the agreements at issue here do not manifest any intent to release Pennaco of its obligations upon assigning its interest. Therefore, application of § 4.4 of the Restatement does not lead to a different result than the application of general principles of contract law. Further, § 4.4 by its terms applies to servitudes where no duration is stated. The obligations to make damage payments and to reclaim in the contracts in this case have stated durations. Section 4.4(1) indicates that an original party, like Pennaco, is liable for a servitude obligation which accrues during the time the party holds the burdened property interest. As we pointed out above, the obligations here accrued during the entire project, and not just during the time High Plains held the mineral leases.

[¶45] In their amici briefs, PAW and TOGA urge this Court not to apply *Seagull*. PAW argues first that *Seagull* has been criticized by oil and gas scholars and commentators. PAW is correct that *Seagull* has been the subject of discussion and concern has been expressed, particularly in the context of joint operating agreements, that parties who have long since transferred their interest in an oil and gas operation might find themselves liable for a subsequent assignee's failure to perform. Preston R. Mundt, *The Assignor Giveth and the Operator Taketh Away: Oil and Gas Interest Owners Beware of Continuing Liability*, 40 Tex. Tech. L. Rev. 419 (Winter 2008); Christopher S. Kulander, David W. Lauitzen, A Flock of Trouble: *Liability Under Oil and Gas Joint Operating Agreements after Seagull v. Eland*, 14 Tex. Wesleyan L. Rev. 217 (Spring 2008). Whether that concern is or is not justified, we simply are not at liberty to re-write parties' agreements. Absent an express provision stating a party's obligations end upon assignment of a surface use agreement like the ones in this case or a release by the surface owner, the party originally obligated under the agreement remains liable.

[¶46] PAW also argues *Seagull* is distinguishable because it involved a joint operating agreement rather than a surface use agreement. PAW asserts joint operating agreements

17

between oil and gas companies require operators to give notice to other owners before initiating significant operations so that each owner can elect whether or not to consent to and pay its share of the cost of the proposed activity. In that context, PAW contends, it makes sense for a consenting owner who assigns its interest to have continuing liability for its agreement to pay if the assignee defaults. PAW contends a surface use agreement is different because an operator who assigns its interest has not been given notice of or consented to pay for the assignee's operations. Again, our task is to interpret the parties' agreement. In these agreements, Pennaco promised to make annual payments until operations cease and the land is reclaimed. Pennaco promised to perform that reclamation. PAW would have this Court ignore the plain language of the parties' agreements and interpret it to mean something different than what it says. We decline to do so.

[¶47] PAW also contends this Court was presented with the opportunity to adopt *Seagull* in *Windsor Energy Group, LLC v. Noble Energy Inc.*, 2014 WY 96, 330 P.3d 285 (Wyo. 2014) and declined to do so. J.M. Huber Corporation (Huber), as operator, and Suncor Energy (Suncor), as non-operator, entered into a joint operating agreement (JOA) for oil and gas development. *Windsor*, ¶ 4, 330 P.3d at 287. The agreement required the operator to bill the non-operator for its share of expenses. Huber assigned its interest to Windsor Energy Group, LLC (Windsor) and Suncor assigned its interest to Dolphin Energy Corporation (Dolphin). *Id.*, ¶ 5, 330 P.3d at 287. When Dolphin failed to pay its share of expenses, Windsor sued Suncor. *Id.*, ¶ 6, 330 P.3d at 287. The district court held that, as a matter of law, Suncor remained liable to Windsor because it did not obtain a release from either Huber or Windsor, and the JOA did not contain a provision releasing Suncor from continued liability after the assignment." *Id.*, ¶ 7, 330 P.3d at 288. After a trial, however, the district court ruled that Windsor's claim against Suncor was barred by laches. *Id.*, ¶ 8, 330 P.3d at 288.

[¶48] Suncor appealed the ruling that it remained liable under the JOA. Windsor appealed the ruling that its claim was barred by laches. This Court affirmed the district court's ruling that laches barred Windsor' claim and did not address the issue of whether Suncor remained liable under the JOA after assigning its interest. PAW contends, however, that in upholding the laches ruling the Court recognized the problems associated with an assignor's continued liability under an agreement involving oil and gas interests, such as the assignor's inability to correct an assignee's actions post-assignment. The difficulties presented for an assignor by its continued liability post-assignment are precisely the reason for including a provision releasing the assignor. *Windsor* does not provide support for a ruling that Pennaco was not bound by the surface use agreement after assigning its interest to CEP-M.

[¶49] As in *Seagull*, other courts have applied general principles of contract law to conclude an assignment does not relieve the assignor of obligations assumed in an agreement. In *Wold v. Diamond Resources, Inc.*, 2001 U.S. Dist. LEXIS 115118 (D.

18

N.D. 2011), owners of mineral rights in North Dakota entered into oil and gas leases with Diamond Resources, Inc. (Diamond). *Id.* at 2. Diamond later assigned its interest to Zavanna. The mineral owners filed complaints in state court against Diamond and Zavanna seeking an order holding that the leases had lapsed, quieting title in their name and cancelling the leases on the ground that royalties had not been paid. *Id.* at 3. Diamond and Zavanna removed the case to federal court. They acknowledged that Diamond was a non-diverse party, but alleged that after the assignment it had no interest in the case and should be dismissed.

[¶50] The U.S. District Court for the District of North Dakota said:

> North Dakota follows the "well-established principle in the law of contract that a contracting party cannot escape its liability on the contract by merely assigning its duties and rights under the contract to a third party." *Rosenberg v. Son, Inc.*, 491 N.W.2d 71, 74, (N.D. 1992); see also *Estate of Murphy v. Murphy*, 554 N.W.2d at 437 ("Even where there is an effective assignment of a contractual obligation, the assignor's 'duty remain absolutely unchanged.'") (quoting 4 Corbin on Contracts § 866). Under North Dakota law, this principle applies to all categories of contracts, including the oil and gas leases at issue here. Cf. *Holman v. State*, 438 N.W.2d 534, 537 (N.D. 1989) ("[D]ocuments conveying oil and gas interests are subject to the same general rules that govern interpretation of contractual agreements.") see generally 5-64 E. Kuntz, A Treatise on the Law of Oil and Gas § 64.7 (Matthew Binder rev. ed. 2011) ["Kuntz"]; 2-4 P. Martin & B. Kramer, Williams & Meyers, Oil and Gas Law § 403.1 (Matthew Bender 2010) ("William & Meyers"). The only manner in which Diamond could have been discharged from its lease obligations is if there was a novation whereby plaintiffs expressly or impliedly consented to the discharge. See *Estate of Murphy*, 554 N.W.2d at 437; *Rosenberg*, 491 N.W.2d at 75.

*Id.* at 5-6. Finding a North Dakota court could conclude the assignment did not discharge Diamond, the federal court remanded the case to state court based on lack of diversity of citizenship.

[¶51] This Court applied the same principles in *Ultra Resources, Inc. v. Hartman*, 2010 WY 36, 226 P.3d 889 (Wyo. 2010). The contract at issue there required First Parties to pay net profit interest on amounts realized from oil and gas operations. *Id.*, ¶ 99, 226 P.3d at 923. Operators and non-operators were successors to the First Parties. *Id.*

19

Another provision of the contract placed the responsibility for handling the accounting of the net profit and remitting payment on the operators. *Id*. Based on the latter provision, the non-operators argued they did not have the duty to pay net profit interest. *Id*., ¶ 100, 226 P.3d at 923-924. The district court rejected the non-operators' position stating that, while the clerical responsibilities for handling the accounting and actually remitting the payments were delegated to the operators under the contract, the ultimate obligation to pay had not been delegated. *Id*. Citing the rule that the performance of a duty can be delegated, but such delegation does not discharge the obligor, the district court held the non-operators were obligated to pay the net profit interest. *Id*. This Court agreed with the district court's interpretation and affirmed. *Id*., ¶ 101, 226 P.3d at 924.

[¶52]    Other courts have applied similar principles when considering whether an assignment relieves the original lessee-assignee from obligations under an agreement relating to mineral development. *Whale v. Rice*, 49 P.2d 737, 741 (Okla. 1935) (noting that although the rentals and royalties became due and payable after the original lessee had assigned the lease, the assignment did not relieve him of the obligation to pay unpaid rentals and royalties falling due under the lease); *Kintner v. Harr*, 408 P.2d 487 (Mont. 1965) (holding that an assignment of a lease terminated privity of estate between the lessor and lessee, but privity of contract remained so the lessee was not released from his obligation or liability under the lease by the assignment). Applying the foregoing cases and authorities to the agreements at issue here, Pennaco remains liable to KD under the surface and water agreements despite having assigned its interest to CEP-M.

### 4. The Arguments of Pennaco and Amici

[¶53]    Pennaco asserts that the above analysis overlooks property law principles applicable when contracting parties enter into an agreement affecting the use of land that contains covenants running with the land. It maintains when an agreement containing covenants running with the land is assigned, the assignee assumes, and the assignor is relieved of, liability under the agreements. Pennaco further asserts when a contract affects the use of land, courts must look to the nature and circumstances of the contract to determine whether an assignment of the contract releases the obligor. When the contract regulates and facilitates the obligor's possession and use of the land, Pennaco maintains, courts presume the parties intended the obligor to be released upon transfer. We begin our analysis of Pennaco's arguments with its claim that the agreements at issue here contain covenants running with the land such that Pennaco was released from its obligations upon assigning the operations to a third party.

[¶54] Pennaco cites two Wyoming cases as support for its assertion that the agreements here contain covenants running with the land such that, upon the assignment to CEP-M, Pennaco was relieved of its obligations. *Mathisen, id*., and *Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC*, 2008 WY 101, 191 P.3d 125 (Wyo. 2008). In *Mathisen*, ¶ 14, 169 P.3d at 65, this Court addressed the question of whether a surface royalty

20

provision in a deed constituted a covenant running with the land such that successors in interest to the party originally obligated to pay the royalty were bound to make the payment. There, Mathisen's predecessor in interest conveyed land to Consolidation Coal Company (Consol). The federal government owned the coal underlying the property and Consol did not have the right to mine it. Even so, the deed conveying the land stated: "As further consideration for the sale and conveyance of said lands by Owner to Consol, Consol shall pay to Owner a surface royalty for all coal mined, removed and sold by Consol" from the property. Consol never acquired the right to mine the coal and subsequently sold the property. Thunder Basin Coal Company (TBCC) later leased the coal from the federal government and the property from Consol's successor in interest and began mining the coal. Mathisen was not paid royalties for the mined coal and brought an action against Consol and its successors in interest seeking payment.

[¶55] This Court concluded first that because the plain language of the deed required Consol to pay the royalty for "coal mined, removed and sold <u>by Consol</u> from said lands," Consol was not obligated to pay the royalty because it never mined any coal. The Court then considered whether the royalty provision in the deed was a covenant running with the land such that TBCC was obligated to pay the royalties.

[¶56] The Court said a covenant that runs with the land is considered to be "appurtenant" to the land and "inures to the benefit of, or must be fulfilled by, whatever party holds the land at the time when fulfillment is due." *Id.* citing *Lingle Water Users' Ass'n v. Occidental Bldg. & Loan Ass'n*, 43 Wyo. 41, 97 P. 385, 387 (Wyo. 1931). We said:

> A party seeking to establish that a covenant runs with the land must demonstrate: 1) the original covenant is enforceable; 2) the parties to the original covenant intended that the covenant run with the land; 3) the covenant touches and concerns the land; and 4) there is privity of estate between the parties to the dispute.

*Id.* Finding the second element determinative, we concluded the landowner had not demonstrated the parties intended the royalty provision to be a covenant running with the land because: 1) the provision stated the royalty was to be paid to the "owner" by Consol specifically and did not refer to either the owner's or Consol's successors or assigns; 2) other provisions of the deed contained "successors and assigns" language, indicating the parties deliberately omitted those words in the royalty clause; and 3) the royalty clause stated the obligation was "further consideration" for the sale of the land "by Owner to Consol," indicating the royalty payment was personal to the parties to the transaction and did not run with the land. *Id.*, ¶¶ 15-17, 169 P.3d at 66.

[¶57] In *Jacobs Ranch*, ¶ 3, 191 P.3d at 128, a case involving some of the same parties as *Mathisen*, the landowner conveyed two parcels to Consol by deeds containing a royalty

21

clause providing that as further consideration for the sale and conveyance of the land by "Grantor to Grantee, Grantee shall pay to Grantor a surface royalty for all coal mined, removed and sold by Grantee, its heirs, successors in interest and assigns…" *Id*. As in *Mathisen*, Consol never mined the coal underlying the lands, and conveyed the parcels to Jacobs Ranch and TBCC respectively. TBCC subsequently mined the coal and the question was whether it was liable for paying royalties to the landowner.

[¶58] We analyzed the surface royalty language and concluded the surface royalty provision was not a covenant running with the land so as to obligate TBCC to pay the royalty. We said:

> This surface royalty provision, like the one in *Mathisen*, specifies that Consol as "Grantee shall pay" the surface royalty. As in *Mathisen*, there is no language indicating that Consol's successors in interest or assigns would be bound by the provision. There is no language expressing the parties' intent that the obligation was a covenant running with the land. We therefore hold, as we did in *Mathisen*, that this surface royalty provision creates an obligation personal to Consol, and not a covenant running with the land.

*Id*., ¶ 13, 191 P.3d at 130.

[¶59] In both *Mathisen* and *Jacobs Ranch* the party originally bound by the covenant, Consol, was only required to pay the surface royalty for coal it mined. Because Consol did not mine the coal before transferring the land, it was not bound by the covenant. The Court did not address the question of whether Consol would have been bound to pay the surface royalty after the transfer if it had mined the coal before transferring its interest. Because *Mathisen* and *Jacobs Ranch* did not address that question, those cases provide no support for Pennaco's assertion that it is not bound by the covenants contained in the agreements at issue here. Pennaco, the party originally bound by the covenants, did produce coalbed methane before assigning its interest to CEP-M.

[¶60] The Court also found in *Mathisen,* ¶ 17, 169 P.3d at 66, and *Jacobs Ranch*, ¶ 21, 191 P.3d at 132, that the surface royalty provision contained in the deeds was not a covenant running with the land; therefore, TBCC, the party to whom the deed was transferred, was not liable for the royalty payments. The Court reached that result by looking at the royalty provision and concluding it did not suggest the parties intended it to be a covenant running with the land. Among the factors the Court considered were: 1) the provision stated "Consol" was to pay the royalty, not "Consol, its successors or assigns;" and 2) there was no language expressing the parties' intent that the obligation was a covenant running with the land. *Mathisen*, ¶ 16, 169 P.3d at 66; *Jacobs Ranch*, ¶ 13, 191 P.3d 130. Like the surface royalty provision in those cases, the agreements at

22

issue here state that "operator" (identified earlier in the agreement as Pennaco), and not "operator, its successors or assigns," is to pay the annual fees until the lands are reclaimed. Like the provisions in *Mathisen* and *Jacobs Ranch*, there is no language stating the obligations imposed upon Pennaco were covenants running with the land.

[¶61] Pennaco asserts the parties' intent to create covenants running with the land is demonstrated by the general provision stating that the agreement is binding on the parties' successors and assigns. Again, citing *Mathisen* and *Jacobs Ranch*, Pennaco contends when a contract concerning land contains "succession" language, that language creates a presumption that the parties intended the agreement to contain covenants running with the land. Given the succession language in the agreements at issue here, Pennaco argues, this Court must presume the parties intended to create covenants running with the land. As indicated above, we note that the Hollcroft water well replacement agreement does not contain such language.

[¶62] Pennaco overstates what was said in *Mathisen*. We said: "<u>Although not dispositive</u> in determining the intent of the parties, the use of words of succession <u>suggests</u> that the provision runs with the land, while omission of such words <u>may suggest</u> the intent that the obligation is personal rather than appurtenant." *Mathisen*, ¶ 15, 169 P.3d at 66. (Emphasis added). Contrary to Pennaco's assertion, the fact that the agreements between Pennaco and KD's predecessor provide they are binding on the parties' successors and assigns is not dispositive of the parties' intent.

[¶63] When interpreting contracts, "we consider the contract as a whole, reading each part in light of all the other parts." *Fremont Homes, Inc. v. Elmer*, 975 P.2d 952, 956 (Wyo. 1999), citing *Examination Management Servs., Inc. v. Kirschbaum,* 927 P.2d 686, 690 (Wyo. 1996). Read in context with other language in the agreements, the provisions binding the parties' successors do not support the conclusion that the parties intended to create covenants running with the land such that Pennaco was released of its obligations under the agreements upon its unilateral assignment of the coalbed methane operations.

[¶64] To reiterate, the surface agreement states Pennaco's <u>rights</u> terminate upon its default or when its right to produce gas on the land terminates. The agreement does not state, however, that Pennaco's <u>obligations</u> end when its rights terminate. In fact, upon final termination of Pennaco's right to produce gas on the lands, the surface agreement expressly requires Pennaco to perform its obligations to reclaim the lands. Similarly, when Pennaco ceases discharging produced water, the disposal of produced water agreement requires Pennaco, upon the surface owner's request, to remove the reservoirs and restore the lands. Additionally, both agreements provide that Pennaco's payment obligations continue until reclamation is complete. The surface agreement states that Pennaco's obligation to make the annual payments on all producing wells continues "each and every year until the well has been plugged and abandoned and the … roads and pipelines constructed in connection therewith have been reclaimed…." The discharge of

produced water agreement provides that Pennaco shall make the annual payments for each reservoir on the same date as the first payment "in each year thereafter" until produced water is no longer being discharged. Considering the agreements as a whole and reading the succession language in light of the provisions expressly stating Pennaco's obligations continue after its rights terminate, any presumption that might otherwise have arisen is not sustainable. The plain language of the agreements does not demonstrate the parties intended Pennaco to be relieved of its obligations upon assigning its interests to CEP-M.

[¶65] Pennaco and its amicus TOGA argue at some length that the parties' intent to release it from the obligations of the contract must be inferred from the fact that the contract required certain acts to be performed upon the land and prohibited others. Pennaco references provisions of the agreements requiring the operator to keep well sites, roads and other areas used by the operator safe and in good order; rehabilitate and restore areas disturbed by the operations within twelve months after disturbance; test the produced water every six months; and keep cattle guards and fences in clean and good repair. Pennaco argues that once it assigned the operations, it was not in the position to perform these obligations and should not be held liable now for subsequent assignees' failure to perform them. In support of its argument, Pennaco cites Restatement (Third) of Property (Servitudes) § 4.4, which is set out above.

[¶66] First, the obligation at issue in this action is the obligation to make annual payments until coalbed methane operations cease and the land is reclaimed, an obligation Pennaco expressly undertook to perform in the agreements it entered into with the landowner. The question is not whether Pennaco was in a position to keep well sites safe or test water produced or make the annual payments when they came due or perform any other act once operations were assigned to CEP-M or High Plains Gas. The question is whether, upon the assignee's failure to make the payments, the landowners could bring an action directly against Pennaco. The answer to that question is "yes." 62-4 CAIL Annual Institute on Oil and Gas Law § 4.03.

[¶67] Second, we question whether the above Restatement applies to these agreements given that their duration is not unstated—the agreements terminate upon cessation of coalbed methane operations and reclamation of the land. Additionally, as KD points out, § 1.1(2) of the Restatement states in pertinent part:

> To the extent that special rules and considerations apply to the following servitudes, they are not within the scope of this Restatement:
> (a)    covenants in leases;
> . . . .
> (c)    profits for the removal of timber, oil, gas, and minerals.

24

Comment *e*. further states:

> Servitudes are used in several specialized areas where the rules and considerations governing their operation are different from those ordinarily applied to the servitudes covered in this Restatement. Landlord-tenant law, real-property security law, oil and gas law, timber law, and the law governing extraction of other minerals are such specialized areas. No attempt has been made in this Restatement to take account of the special rules and considerations governing servitudes used in those contexts.

[¶68] This section of the Restatement recognizes that landlord tenant law has a different result. Comment *b* to § 404 points out that with leases, the original tenant generally remains liable on the covenants in the lease after assignment. The parties' relationship here is much more similar to a lease or standard contract than it is to unending covenants based on land ownership.

[¶69] As in the case of a lease transaction, the duration of Pennaco's liability under the surface agreement is limited by its terms to the completion of coalbed methane operations and reclamation. Like the parties to a lease transaction, the landowners here likely relied on Pennaco's creditworthiness in determining to enter into the surface agreement. We simply are not persuaded that the principles relating to servitudes apply to the obligations Pennaco assumed under the agreements at issue here. Even if we were to conclude they did apply, § 4.7 addresses the delegability and transfer of servitudes burdens as follows:

> (1) The person obligated to perform a duty imposed by a servitude can delegate the duty to another unless the delegation is contrary to public policy, or, <u>unless the holder of the benefit of the servitude has a substantial interest in having the person burdened by the servitude perform or control the acts required by the servitude</u>.

(Emphasis added). The landowners here likely had a substantial interest in having Pennaco, the entity with which they entered into the surface use agreements, perform the acts required by the agreement. This is so because the covenants required at the end of the contractual arrangement – payments even when production is ending and reclamation – can only be performed by an entity with the financial ability to do so.

[¶70] In addition to the question of whether the Restatement applies, Pennaco's argument necessarily assumes that the agreements it entered into with the landowners created servitudes. Section 1.1(1) of the Restatement defines servitude as "a legal device

25

that creates a right or an obligation that runs with the land or an interest in land." As with other types of agreements, the intent of the parties to create servitudes is determined first by looking at the language of the agreement itself.

> Because servitudes are interests in land with potentially long-term effects on land use and value, they should be expressly created by carefully drawn written instruments. A contract or conveyance intended to create a servitude should express that intent in words that unambiguously spell out the nature and terms of the intended servitude.

*Id*., § 2.2, comment *a*. Again, there is no language in the agreements between the landowner and Pennaco stating the parties intended to create servitudes.

[¶71] Pennaco and amici essentially ask this Court to imply the agreements here created servitudes. "To avoid unfairness, American courts generally seek to ascertain and give effect to the intentions of the parties, even though imperfectly expressed." *Id*. Thus, servitudes may be express or implied. *Id*., § 2.2. However,

> Courts are justifiably hesitant to find the intent to create servitudes in vague language … because servitudes create interests running with the land that affect people beyond the immediate parties.

*Id*., comment *d*. Absent more precise language, we are unwilling to imply Pennaco and the landowners intended to create servitudes running with the land such that Pennaco's obligations cease upon assignment. That simply is not what the agreements provide.

[¶72] Pennaco and amici seek to have this Court imply a servitude burdening the property of the landowner until coalbed methane operations cease but excusing Pennaco's performance of its obligations before those operations cease. Cases in which one party to a conveyance claims that it was intended to create a servitude burdening the property of the other "raise the prospect that one party will be unfairly burdened with a servitude the transaction was not intended to create." Section 2.11, comment *c*.

> Because of these problems, servitude burdens are established by implication only where public policy supports implication of the servitude to avoid economic waste, or where the evidentiary concerns underlying the Statute of Frauds have been met and establishment of the servitude is necessary to prevent injustice.

26

No argument is presented that creation of a servitude should be implied here to avoid economic waste or to prevent injustice. The agreements at issue in this case do not expressly state that they create servitudes and, under the circumstances presented, we decline the invitation to imply the parties intended the agreements to create servitudes.

### 5. *Policy Arguments*

[¶73] TOGA asserts a holding that Pennaco remains liable under the surface and water agreements despite the assignment "exposes oil and gas operators to unpredictable and indeterminate liability for duties respecting the use of lands (1) to which they have no access and (2) based on the acts of successors over which they have no control." Given that Pennaco expressly reserved "its right, title and interest in the easements to the extent they were attributable to its retained interests" as well as its right to complete, plug and abandon wells and restore the sites at CEP-M's expense if CEP-M failed to do so, we see no basis for TOGA's assertion that Pennaco has no access to the land.

[¶74] As for the contention that oil and gas operators will be exposed to liability based on the acts of successors over which they have no control, the solution is a simple one. An operator may be discharged from obligations it assumes in a surface or water storage agreement either by including an exculpatory clause excusing it from further liability after assignment or by novation, in which it transfers its duties to a third party with the landowner's consent. William & Meyers, *Oil & Gas Law,* § 403.1; *Seagull*, 207 S.W.3d at 347; *Wold,* 2011 U.S. Dist LEXIS, at 5-6. *See also Williams v. McWhorter*, 30 Wyo. 229, 232, 218 P. 791, 793 (1923). Pennaco is experienced in the oil and gas business, where surface and water agreements and assignments are regularly used, and could have acted to protect its interests by bargaining for language excusing it from liability or obtaining the landowner's consent to transfer its duties to CEP-M. It failed to do so, and this Court will not depart from firmly established rules of law to insulate Pennaco from its lack of care. The record shows that Pennaco attempted to obtain consent from KD for the assignment of an easement to CEP-M, perhaps believing that such consent would amount to a novation. KD did not consent. The record indicates Pennaco did not request that KD or the Hollcrofts release Pennaco from its contractual obligations, and the landowners did not execute any such releases.

[¶75] PAW asks the Court to overlook the plain language of the agreements and, by applying other interpretative devices – specifically the law of servitudes or covenants running with the land – arrive at an interpretation that is contrary to both the plain language and firmly established rules of law. In an effort to persuade the Court to reverse the district court and hold that Pennaco is not liable under the agreements, PAW points to certain "facts," which it asserts will result if the district court's decision is upheld. Among those "facts" are: a flood of litigation, denying mineral developers the use of traditional common law defenses (such as laches) to claims by landowners, decreased use of surface agreements by the industry, and a chilling of mineral production. Whether or

27

not these "facts" will materialize as a result of this Court's holding is simply speculation. Our duty is to apply the law to the plain language in the contracts.

### 6. *Hollcroft Lease Exculpatory Provision*

[¶76] Addressing its agreements with the Hollcrofts, Pennaco points to a clause in the mineral leases covering their lands that expressly absolves Pennaco of liability for the acts or omissions of a successor lessee[5]. Pennaco asserts the Hollcrofts are successors to the lessor under the mineral leases and, as such, are bound by the exculpatory clause. Pennaco argues the mineral leases and surface use agreement are part of the same transaction and must be read together. Pennaco makes the same argument with respect to the replacement water well agreements it entered into with the Hollcrofts. Pennaco further asserts because the surface use agreement references the mineral leases, the exculpatory clause contained in the leases is incorporated into the surface use agreement.

[¶77] There are two mineral leases at issue. They state they are agreements entered into in June of 1998 between the lessors and High Plains Associates, Inc., as lessee. The first lease identifies Delbert and Maurine Hollcroft & Hollcroft & Company as lessors. The second lease identifies Hollcroft & Company as lessor. Both leases provide the rights of the lessor and lessee may be assigned in whole or in part. The leases further state: "if all or any part of this lease is assigned, no leasehold owner shall be liable for an act or omission of any other leasehold owner."

[¶78] The surface use agreement references the leases as follows:

> Operator represents that it owns operating rights and is an assignee of an interest in a valid Gas Lease or Gas Leases covering portions of the subject lands or adjacent lands …. It is understood and agreed that this Agreement cannot be used for the drilling of wells other than those necessary and prudent for the development of the coal bed methane strata covered by Operator's Gas Leases.

[¶79] Under general contract principles, when a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together. *See* 11 Williston on Contracts § 30.25 (4th ed. 2015 Supp.) *See also Knight v. TCB Constr. and Design, LLC*, 2011 WY 27, ¶ 13, 248 P.3d 178, 182 (Wyo. 2011). ("A contract may refer elsewhere for full understanding of its terms, just as it may adopt another document by reference.") However, in order for an instrument to be incorporated into and become part

---

[5] This opinion does not address whether the language in the Hollcroft leases, or any particular language, is or is not sufficient to excuse an assignor of an agreement like those in this case from further liability after assignment.

28

of a contract, the instrument must actually be incorporated. *Gross v. WB Texas Resort Communities, L.P.,* 2014 Tex. App. LEXIS 13775 (Ct. of App. Tex. 2014). It is not enough for the contract to merely mention the instrument; the referring language in the contract must demonstrate the parties intended to incorporate all or part of the referenced instrument. *Id.* Parties do not undertake obligations contained in a separate document unless their contract clearly says so. *Prichard v. Clay,* 780 P.2d 359, 361 (Alaska 1989). A reference in a contract to another instrument will incorporate the other instrument only to the extent indicated and for the specific purpose indicated. *Id. See also Housing Authority v. Snyder*, 44 P.3d 724 (Utah 2002). (To incorporate the terms of another instrument into a contract, the reference must be clear and unequivocal, and alert the non-drafting party that terms from another document are being incorporated.)

[¶80] This Court applied these principles in *Marcam Mortg. Corp. v. Black*, 686 P.2d 575, 577 (Wyo. 1984). There the parties' contract referred to an initial installment land contract, a copy of which was attached and marked as an exhibit, and expressly stated it was "incorporated by this reference as if fully set forth herein." The Court held the contract incorporated the original contract by reference and the two contracts were to be construed as one agreement.

[¶81] In contrast, the Court in *Prichard*, 780 P.2d at 361, concluded a reference in a purchase and sale agreement (PSA) to a prior lease fell short of incorporating the terms of the lease. The PSA provided the purchasers had read and reviewed the terms and conditions of the lease and agreed to assume the obligation of payment and the mortgage on the lease. The PSA did not explicitly state purchasers assumed any other lease term. The court concluded although the language in the PSA evidenced the parties' knowledge of the lease terms and conditions, it did not evidence their intent to abide by those terms and conditions.

[¶82] The surface use agreement at issue in the present case does not state the lease is incorporated by reference. It states only that Pennaco owns operating rights and is an assignee of an interest in gas leases and the surface use agreement is for the purpose of drilling wells to develop coalbed methane on lands covered by the leases. Although this language is evidence that the parties knew Pennaco owned the leases and would be drilling on the leased land, it does not evidence an intent to incorporate the terms of the leases into the surface use agreement. The mere mention of the leases is simply insufficient to support the conclusion that the exculpatory clause contained in the leases is incorporated in the surface use agreement.

[¶83] In February of 2009, Hollcrofts and Pennaco also entered into two agreements for replacement of water wells. The agreements state Pennaco's coalbed methane operations had impaired Hollcrofts' water wells #8 and #10, respectively. Pennaco agreed to pay the costs associated with drilling and supplying electricity to two replacement wells, and the cost of constructing and supplying power to two stock tanks. Upon termination of the

surface use and water well agreements, Pennaco agreed to pay Hollcrofts an amount equal to three times the annualized cost of electricity for the wells. Upon completion of the replacement water wells, Pennaco agreed to restore the lands. The replacement well agreements contain no reference to the leases, but do provide:

> 9. This Agreement constitutes the entire Agreement between the parties regarding the Hollcroft #8 [and #10 by separate agreement] well, and any prior understanding or representation of any kind preceding the date of this agreement shall not be binding on either party except to the extent incorporated into this agreement. …

By their clear and unequivocal terms, the water well replacement agreements do not incorporate the exculpatory clause contained in the lease.

### 7. *Attorney Fees and Costs*

[¶84] Attorney fees are recoverable if expressly provided for by statute or contract. Where a contract allows the award of attorney fees, that includes fees incurred on appeal. *Hofhine v. Hofhine*, 2014 WY 86, ¶ 18, 330 P.3d 242, 247 (Wyo. 2014), quoting *Kinstler v. RTB South Greeley, LTD., LLC*, 2007 WY 98, ¶ 13, 160 P.3d 1125, 1129 (Wyo. 2007). The surface and damage agreement between KD's predecessor and Pennaco states that "if Operator defaults" the landowner is to provide written notice of the default. If the operator fails to correct the default within sixty days, and if operator disagrees that it is in default, either party may file an action for judgment declaring whether operator defaulted. The agreement provides the prevailing party "shall be" entitled to recover attorney fees and costs. Pursuant to this provision, the district court awarded KD $16,074.03 in costs and attorney fees.

[¶85] The replacement water well agreements between Hollcrofts and Pennaco provide: "If Pennaco Energy defaults under this agreement, Pennaco Energy shall pay all costs and expenses, including reasonable attorney's fees, incurred by Hollcroft in enforcing this agreement." Pursuant to this provision, the district court awarded Hollcrofts $15,618.09 as attorney fees and costs.

[¶86] Pennaco contends the district court's attorney fee awards are erroneous because Pennaco was not in default under the agreements.[6] We disagree. The surface agreement required Pennaco to make the annual payments until the coalbed methane wells were plugged and abandoned and the lands were reclaimed. The replacement water well agreements provided:

---

[6] Pennaco does not contest the amount of the fees and costs awarded.

30

1. … Upon termination of the Surface Use Agreement and Water Well agreement governing these lands, Pennaco Energy shall pay Hollcroft an amount equal to three (3) times the annualized electric cost reimbursement most recently paid pursuant to this Agreement regarding the Hollcroft #8 [and #10]. Upon making these payments, Pennaco Energy shall have no further obligation with respect the Hollcroft #8 [and #10].

As we have said, Pennaco remained liable under the agreements despite the assignments to CLP-M and High Plains Gas. Upon their default, Pennaco was obligated to make the payments. Pennaco has not made the annual payments due under the surface agreement until the lands are restored and it has not made the payments under the replacement water well agreements as required. Having not made the payments, Pennaco is in default and the district court properly awarded the landowners attorney fees and costs. The landowners are also entitled to the attorney fees and costs incurred on appeal. *Hofhine, id*.

## CONCLUSION

[¶87] The plain language of the surface and water agreements entered into between landowners and Pennaco required Pennaco to perform certain obligations until the coalbed methane operations ceased and the lands were reclaimed. Those agreements did not contain language indicating any intent that Pennaco would be discharged from its obligations upon assignment to a third party. To the contrary, the surface use and water agreements contained numerous indications that Pennaco's contractual obligations continued even after assignment. Therefore, under firmly established principles of contract law, and because there was no express clause that terminated Pennaco's obligations upon assigning the agreements to a third party, Pennaco remained liable to the landowners to perform the covenants in the event its assignee defaulted.

[¶90] We affirm.

31